## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
)
THE UNITED STATES OF AMERICA; and    )    Civil Action No. _____
)
THE STATE OF NEW YORK,    )
)    **COMPLAINT**
*ex rel.* [UNDER SEAL],    )
)
           Plaintiffs,    )
)
    v.    )    **<u>UNDER SEAL</u>**
)    **Pursuant to 31 U.S.C. § 3730(b)(2)**
[UNDER SEAL],    )
)
)
)
)
)
)
           Defendants.    )
)
———————————————————————x

## <u>COMPLAINT</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

—————————————————————x
                        )

THE UNITED STATES OF AMERICA; and   )    Civil Action No. _____
                        )

THE STATE OF NEW YORK,          )
                        )    **COMPLAINT**

*ex rel.* JENNIFER LYON,           )
                        )

          Plaintiffs,     )
                        )

      v.              )    <u>**UNDER SEAL**</u>
                        )    **Pursuant to 31 U.S.C. § 3730(b)(2)**

ACCELECARE WOUND CENTERS, INC;   )
GARY TANNENBAUM, M.D.;          )
NIRAV PATEL, D.O.;             )
ST. JOHN'S RIVERSIDE HOSPITAL; and   )
ALBANY MEMORIAL HOSPITAL,     )
                        )

          Defendants.   )
                        )
—————————————————————x

<u>**COMPLAINT**</u>

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................1

II.     JURISDICTION AND VENUE ..............................................................2

III.    PARTIES ...............................................................................................3

IV.     LEGAL AND REGULATORY BACKGROUND ....................................5

    A.      The False Claims Act...............................................................5

    B.      Medicare and Medicaid and Hyperbaric Oxygen Therapy Services ......................7

        1.      Medicare and Medicaid Generally.................................................7

        2.      Hyperbaric Oxygen Therapy Benefits .........................................9

        3.      Hyperbaric Oxygen Therapy Requirements Under Medicare and Medicaid ..................10

V.      DEFENDANTS' FRAUDULENT CONDUCT ........................................11

    A.      HBO Therapy Services at Accelecare Facilities..................................12

    B.      Fraudulent Billing of HBO Therapy Services .....................................14

    C.      Relator Blows the Whistle ..................................................16

    D.      Examples of Defendants' False Claims .................................19

COUNT I Federal False Claims Act Violations for Submission of False Claims  31 U.S.C. § 3729(a)(1)(A) ...........................................................25

COUNT II Federal False Claims Act Violations for False Records and Statements  Made to Get False Claims Submitted Paid  31 U.S.C. § 3729(a)(1)(B) ......................26

COUNT III Violation of the New York False Claims Act N.Y. State Finance Law § 189...........27

DEMAND FOR JURY TRIAL ...........................................................29

Plaintiff-Relator Jennifer Lyon ("Lyon" or "Relator"), on behalf of the United States of America (the "United States"), and on behalf of the State of New York, pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and the parallel provisions of the New York False Claims Act, N.Y. State Finance Law §§ 187 *et seq.* (the New York FCA), files this Complaint against Accelecare Wound Centers, Inc. ("Accelecare"), Gary Tannenbaum, M.D. ("Dr. Tannenbaum"), Nirav Patel, D.O. ("Dr. Patel"), St. John's Riverside Hospital and Albany Memorial Hospital (collectively, the "Defendants"). In support thereof, Relator alleges as follows:

## I.     INTRODUCTION

1.     Relator Jennifer Lyon brings this action on behalf of the United States and the State of New York to recover penalties and damages arising from Defendants' fraudulent practices in connection with Hyperbaric Oxygen ("HBO") therapy services to Medicare and Medicaid beneficiaries.

2.     Pursuant to its contracts with hospitals, Accelecare provides HBO therapy services on-site on an out-patient basis. As of the date of this Complaint, Accelecare contracts with over 75 hospitals nationwide, including St. John's Riverside Hospital ("St. John's") in Yonkers, New York and Albany Memorial Hospital ("Albany Memorial") in Albany, New York.

3.     As alleged herein, since at least September 2011, Accelecare has systematically defrauded Medicare and Medicaid by submitting or causing to be submitted false claims for payment for "physician" services in connection with HBO therapy even though the treating physician was known not to be on-site or was inaccessible in violation of the Medicare and Medicaid policies and procedures governing HBO therapy.

4.     As alleged herein, since at least September 2011, Drs. Tannenbaum and Patel have systematically defrauded Medicare and Medicaid by submitting or causing to be submitted claims for payment for "physician services" in connection with HBO therapy even though they knew they had not been on-site or were inaccessible at the time the therapy was given in violation of the Medicare and Medicaid policies and procedures governing HBO therapy.

5.     Defendants' actions have been designed and intended solely to maximize profits by lining their pockets with government entitlement funds at the expense of the Medicare and Medicaid programs, and American taxpayers.

## II.     JURISDICTION AND VENUE

6.     Relator brings this action on behalf of the United States and the State of New York pursuant to the federal FCA and the New York FCA, respectively.

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and (b), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730 and parallel provisions of the New York FCA.

8.     This Court has personal jurisdiction over Defendants, and venue is proper in this District, pursuant to 31 U.S.C. § 3732(a) because Defendants are found, transact business, and committed violations of 31 U.S.C. § 3729 in this District.

9.     Relator has served a copy of the Complaint and written disclosure of substantially all material evidence and information in her possession in accordance with 31 U.S.C. § 3730(b)(2) and parallel provisions of the New York FCA.

10.    This action is not based upon prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation; in the news

media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A) and parallel provisions of the New York FCA.

    11.    To the extent there has been a public disclosure unknown to Relator of any of her allegations, she is an "original source" of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B) and parallel provisions of the New York FCA.

### III.    <u>PARTIES</u>

    12.    Relator Jennifer Lyon is a citizen of the United States and a resident of the State of Connecticut. Ms. Lyon is the Director of Hyperbaric Medicine at the Accelecare facility located at St. John's Riverside Hospital, in Yonkers, New York. Ms. Lyon was thus in a unique position to witness Defendants' fraudulent schemes in action. Ms. Lyon's personal knowledge of Defendants' illegal conduct is supported by her own personal investigation undertaken to further develop and substantiate the allegations set forth in this Complaint concerning Defendants' activities.

    13.    Defendant Accelecare Wound Centers, Inc. is a Delaware corporation with its headquarters located at 10900 NE 4th Street, Bellevue, Washington. Since 2007, Accelecare has contracted with hospitals nationwide to provide wound care services, including Hyberbaric Oxygen Therapy, on an out-patient basis.

    14.    Defendant Gary Tannenbaum, M.D., is the Medical Director of the Wound Center; the Director of the Department of Surgery; the Chief of the Division of Vascular Surgery; and Medical Director of the Vascular Laboratory at St. John's. Dr. Tannenbaum is also in private practice as a physician and owner of Westchester Surgical Specialists ("WSS"), located at 984 North Broadway Suite 501, Yonkers, New York 10701. Dr. Tannenbaum was

often responsible for overseeing the administration of wound care therapy, including HBO therapy, to patients at St. John's Riverside Hospital.

15.     Defendant Nirav Patel, D.O., is a physician specializing in vascular surgery.  Dr. Patel is affiliated with WSS, located at 984 North Broadway Suite 501, Yonkers, New York 10701.  Dr. Patel was often responsible for overseeing the administration of wound care therapy, including HBO therapy, to patients at St. John's Riverside Hospital.

16.     St. John's Riverside Hospital has its headquarters at the Andrus Pavilion, 967 North Broadway, Yonkers, New York, and serves Yonkers and the Rivertown communities of Hastings-on-Hudson, Ardsley, Dobbs Ferry and Irvington.   St. John's services include: emergency services, inpatient acute care ambulatory surgery services, outpatient diagnosis and treatment, and health/wellness education and screening programs along with support groups for the benefit of those it serves.  St. John's also has an established Hyperbaric Oxygen Therapy program which is run in conjunction with the Wound Healing Center.

17.     Albany Memorial Hospital is a 165-bed community hospital located at 600 Northern Boulevard in Albany, New York, and offers a vast range of services, including critical care, ambulatory surgery, diabetes management, care for congestive heart failure, and state-of-the-art outpatient wound services at the Center for Wound Care and Hyperbaric Medicine, which is the only one in the immediate Albany region to have a hyperbaric chamber for HBO therapy. The Medical Director of the would care center is Glenn Sloat, M.D., who specializes in internal medicine and undersea and hyperbaric medicine.

18.     The United States is the real plaintiff-in-interest with respect to the claims asserted herein.  The United States, acting through the Department of Health and Human Services (HHS), and its Centers for Medicare and Medicaid Services (CMS), administers the

Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (Medicare), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* (Medicaid).

19.     Real plaintiff-in-interest the State of New York participates in the Medicaid program and has adopted laws or regulations governing reimbursement for Hyperbaric Oxygen Therapy, and has also enacted its own state False Claims Act which permits a private person to sue on its behalf to recover for false and fraudulent claims made to its Medicaid program.

## IV.    LEGAL AND REGULATORY BACKGROUND

### A.    The False Claims Act

20.     The False Claims Act, 31 U.S.C. § 3729, as amended, provides:

> (a)    **Liability for certain acts –**
>
> (1) IN GENERAL- Subject to paragraph (2), any person who--
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> *      *      *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(l)-(2) (2006), amended by, 31 U.S.C. § 3729(a)(1)(A)-(B) (West 2010).

21.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

22.     "Knowingly" is defined by the FCA as "mean[ing] that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information...." 31 U.S.C. § 3729(b)(1).

23.     Given its remedial purposes, the FCA is interpreted broadly, and is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

24.     The FCA empowers a private person having information regarding a false or fraudulent claim against the Government to bring an action on the Government's behalf and to share in any recovery.   31 U.S.C. § 3730.   The complaint must be filed under seal without service on the defendant.   *Id.*   The complaint remains under seal to give the Government an opportunity to conduct an investigation into the allegations and to determine whether to join the action. *Id.*

25.     The New York FCA has analagous *qui tam* provisions and procedures described above with respect to the federal FCA.   N.Y. State Fin. § 190.

26.     Pursuant to the FCA and New York FCA, Relator seeks to recover, on behalf of the United States and the State of New York, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements that the Defendants caused to be submitted for payments that Defendants knew or should have known were going to come from the Medicare and/or Medicaid programs.

### B.      Medicare and Medicaid and Hyperbaric Oxygen Therapy Services

#### 1.      Medicare and Medicaid Generally

27.     The Medicare Program, as enacted by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, is a federally funded and administered health insurance program primarily for the elderly and disabled.  Medicare Part B ("Part B") covers physician services and items provided to beneficiaries in an out-patient setting.  42 C.F.R. § 410.

28.     As a condition of participation in and for payment by the Medicare program, health care providers, such as the Defendants, must enter into an agreement ("Provider Agreement") with the Secretary of HHS.  42 U.S.C. § 1395.  After entering into a Provider Agreement, Medicare directly pays the provider a pre-determined rate for care provided to covered patients.  *See* 42 C.F.R. § 414.

29.     Once the provider has an agreement in effect, the provider is required to follow the rules and regulations governing Medicare coverage and payment for the provider's services.  *See* 42 C.F.R. § 424.

30.     Since its enactment and implementation, the Medicare program has enabled elderly, disabled and low-income patients to obtain necessary medical services.  The viability and solvency of Medicare critically depends upon providers' agreements to limit their billing to services provided to individuals who are duly eligible for benefits pursuant to program rules and regulations rather than to engage in fraud and abuse.

31.     The Medicaid Program, as enacted by Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, is a joint federal-state program that provides health care benefits for certain groups, primarily indigent and disabled individuals.  The federal Medicaid statute establishes the minimum requirements for state Medicaid programs to qualify for federal funding.  42 U.S.C. § 1396a.  The federal portion of each state's Medicaid payments, known as

the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).

32.     As with Medicare, in order to participate in and receive payment from the Medicaid program, health care providers, such as the Defendants, must enter into an agreement ("Provider Agreement"). 42 U.S.C. § 1396s(c).

33.     Providers of covered services are generally required to bill Medicare or Medicaid on standardized claim forms. Physicians submit claims on Form CMS 1500, while Institutional providers (e.g., hospitals) submit claims on Form CMS 1450, also known as a Form UB-04. Both forms contain representations and certifications which represent that: (1) submission of the claim constitutes certification that the billing information is true, accurate and complete; and (2) the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. Additionally, the UB-04 form expressly states:

> The submitter of this form understands that misrepresentation or falsification of essential information as requested by this form may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s).
>
> . . .
>
> For Medicaid purposes:  The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

34.     Claims for payment knowingly submitted to Medicare or Medicaid that fail to meet the Medicare or Medicaid conditions of payment as set forth in applicable statutes, regulations and requirements constitute false and fraudulent claims under the FCA and New York FCA, creating liability for anyone who submitted or caused to be submitted false claims.

## 2.    Hyperbaric Oxygen Therapy Benefits

35.    Hyperbaric Oxygen (HBO) therapy involves the inhalation of 100% oxygen at an elevated (i.e., greater than sea-level) atmospheric pressure.  In the treatment of wounds, this is typically between 2 to 2.5 atmospheric absolute (ATA).  Originally developed for the treatment of decompression sickness, HBO therapy is used by some physicians in the management of a variety of chronic wounds, such as: pressure ulcers, wounds secondary to infection, diabetic foot ulcers, arterial ulcers, traumatic wounds, post operative wounds, radiation tissue damage, gangrene, and compromised skin grafts.  The theory is that wounds have a reduced oxygen supply that impairs wound healing.  By delivering oxygen to the body under hyperbaric conditions, tissue oxygen levels are raised to enhance wound healing.

36.    The delivery system for HBO uses either a monoplace (single person) chamber or multiplace (multiple person) chamber.  In monoplace chambers, the entire chamber is pressurized with 100% oxygen to the desired ATA.  Multiplace chambers, which can accommodate between 2-12 patients, are pressurized (using compressed air) and the patients breathe 100% oxygen either via mask, head tent, or endotracheal tube.  In either setting, the time the patient spends in the chamber under hyperbaric conditions is decided by the attending physician and generally ranges from one to two hours.

37.    Potential risks for patients undergoing treatment with HBO therapy include pressure related traumas (e.g., barotraumatic otitis, pneumothorax) and adverse effects due to oxygen toxicity (e.g., myopia, seizures).  Some patients may experience claustrophobia due to the confined space of the chambers.  Most adverse events are self-limited and resolve after termination of therapy.  Patients with barotraumatic otitis may require the placement of myringotomy tubes.

38.     Medicare and Medicaid will only reimburse for HBO therapy services which are medically reasonable and necessary.  *See e.g.,* 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396–1.

39.     Medicare covers HBO therapy under hospital outpatient services (42 U.S.C. § 1861(s)(2)(B)); physician services (§§ 1861(q), 1861(s)(1)); or, incident to physician services § 1861(s)(2)(A)).

40.     The use of HBO therapy is covered as adjunctive therapy only after there are no measurable signs of healing for at least 30 days of treatment with standard wound therapy and must be used in addition to standard wound care.  Failure to respond to standard wound care occurs when there are no measurable signs of healing for at least 30 consecutive days.  Wounds must be evaluated at least every 30 days during administration of HBO therapy.  Continued treatment with HBO therapy is not covered if measurable signs of healing have not been demonstrated within any 30-day period of treatment.

41.     Reimbursement for HBO therapy is made under HCPCS code C1300, *Hyperbaric oxygen under pressure, full body chamber, per 30 minute interval*; and CPT code 99183, *Physician attendance and supervision of hyperbaric oxygen therapy, per session.*

### 3.     Hyperbaric Oxygen Therapy Requirements Under Medicare and Medicaid

42.     As a condition of coverage by Medicare or Medicaid of HBO therapy, providers, including treating physicians, are required, among other things, to meet certain criteria in carrying out the treatment.

43.     As relevant here, HBO therapy is performed on an out-patient basis and must be performed under "direct supervision" of the treating physician.

44.   In the hospital outpatient setting, "direct supervision" per 42 CFR § 410.27(f) means the physician must be present and on the premises of the location and immediately available to furnish assistance and direction throughout the performance of the procedure.

45.   The supervising provider must be trained and certified in Advanced Cardiac Life Support (ACLS).

46.   If the supervising provider response time to the chamber may be expected to exceed five minutes, the personnel that is chamber side during HBO therapy must be ACLS trained and certified.

47.   HBO therapy performed in a hospital outpatient department is an "incident to" service and requires physician supervision.   This requirement is presumed to be met when services are performed on the hospital premises (i.e., certified as part of the hospital and part of the hospital campus); however, in all locations, it is recommended that the physician be present during the ascent and descent portions of the HBO treatment.

48.   "Immediately available" in the context of HBO therapy performed in an on-campus provider-based department or in an off-campus hospital site is defined as the supervising physician or qualified non-physician practictioner ("NPP") present in the office suite or a maximum response time to the chamber of five minutes.  The supervising physician or qualified NPP must be present in the office suite for HBO therapy performed in a non-hospital setting.

49.   In submitting claims for reimbursement of HBO therapy services, providers certify that all of these conditions are met.

## V.   **DEFENDANTS' FRAUDULENT CONDUCT**

50.   Since at least 2007, Accelecare has operated wound centers under contract within various hospitals throughout the country.

51.     According to its website, www.accelecare.com, Accelecare describes itself as a "comprehensive wound care and disease management company" that provides "full service wound management solutions to hospitals and related health care organizations."

52.     Furthermore, Accelecare boasts that "working in conjunction with hospital administration, physicians, nurses, physical therapist," it "provide[s] valuable care for patients and a proven new source of revenue for hospitals."

## A.    HBO Therapy Services at Accelecare Facilities

53.     Since September 2011, Accelecare has operated the wound center under a contract with St. John's.   St. John's, and Drs. Tannenbaum and Patel, through their private practice at WSS, are qualified Medicare and Medicaid providers, and, as such, are eligible to provide HBO therapy to Medicare and Medicaid beneficiaries, to bill Medicare and Medicaid for the services, and to be paid directly from Medicare and Medicaid.

54.     Since December 2011, Accelecare has operated the Center for Wound Care and Hyperbaric Medicine at Albany Memorial.

55.     Accelecare's contracts with St. John's and Albany Memorial contracts, similar to all the contracts Accelecare has with its other hospital partners, provide that Accelecare will supply the equipment necessary for HBO therapy, and employ the technicians who administer the treatment.  The contracting hospital provides the physical space and the physicians to oversee the treatments.

56.     The contracting hospital pays Accelecare a monthly fee to operate the wound center on-location.   Additionally, Accelecare is paid for each treatment performed at an Accelecare wound center.   For example, at St. John's, Accelecare was paid approximately

$70.38 for each 30-minute unit of HBO therapy performed there, with an entire session lasting two hours (i.e., four 30-minute units).

57.     When a patient completes HBO therapy, an Accelecare technician would complete a "super-bill" listing the services and the appropriate procedure codes for the treatment.

58.     A typical super-bill for a two hour HBO treatment session would include four units billed under procedure code C-1300, *Hyperbaric oxygen under pressure, full body chamber, per 30 minute interval*, for a total of approximately $281.52; and one unit billed under procedure code 99183, *Physician attendance and supervision of hyperbaric oxygen therapy, per session.*

59.     The treating physician scheduled to oversee the procedure would sign the super-bill, certifying that the physician had, in fact, supervised the treatment and that the billing was accurate. The physician would then return the super-bill to an Accelecare employee.

60.     Accelecare would submit the super-bill to the Medical Secretary for the wound center, who would then send one copy of the super-bill to the hospital's billing department, and one copy to the treating physician, or that physician's group practice.

61.     For example, the bills that St. John's and WSS submitted to Medicare and Medicaid were created by an Accelecare technician, then signed and approved by the physician assigned to oversee the treatment. A copy of the super-bill would be sent to the St. John's billing department, while the other would be sent to Drs. Tannenbaum and/or Patel at WSS.

62.     St. John's would then bill Medicare and Medicaid approximately $125 for *each* unit billed under procedure code C-1300, or approximately $500 per HBO therapy session.

### B.      Fraudulent Billing of HBO Therapy Services

63.      Drs. Tannenbaum and Patel were the two physicians primarily responsible for overseeing HBO therapy at the Accelecare facility at St. John's.  The vast majority of patients in need of HBO therapy are referred by WSS, Drs. Tannenbaum's and Patel's private practice group.

64.      Drs. Patel and Tannenbaum, through WSS, would bill Medicare and Medicaid approximately $120 under procedure code 99183 for *each* HBO therapy session that was purportedly under their "direct supervision."

65.      Medicare and Medicaid beneficiaries, who underwent HBO therapy at Accelecare-St. John's were regularly treated by an Accelecare technician, and not a physician. Indeed, the overseeing physicians were rarely present at any point before, during, or after HBO therapy, and had no meaningful contact with the patients.   In fact, the average patient who received HBO therapy at this location had meaningful contact with a physician, at most, during only one out of every ten visits.

66.      Rather than rendering services on-site to the HBO patients, the overseeing physicians at Accelecare-St. John's routinely were seeing other patients, performing surgery, or simply not on-site during the HBO therapy sessions as required.   It became standard operating procedure for Accelecare to simply place patients in the hyperbaric oxygen chamber (informally known at the facility as "diving" the patient) without any physician supervision or consultation whatsoever.

67.      Despite their actual whereabouts at the time patients underwent HBO therapy, Drs. Tannenbaum and Patel nevertheless routinely certified that they had "provided direct supervision" and were "immediately available" for the HBO therapy session.

68.     Relator personally witnessed this same conduct at the Accelecare-Albany Memorial wound center.   On or about June 28, 2012, Relator was assisting a short-staffed Accelecare team at Albany Memorial and witnessed approximately 11-12 patients who were "dived" with no contact by the treating physician who had been scheduled to see them.   Only once during the entire day was a physician immediately available during a patient's HBO therapy and that was because the patient fell in the HBO chamber and required medical attention.

69.     When Relator inquired about the lack of direct supervision by the treating physician during HBO therapy, she was told by the Lead Clinical Nurse that the treating physician had been asked to make patient contact per Medicare guidelines, but because doing so would "interrupt clinic flow" in the Wound Care Center, there simply was to be no contact between the patient and physician.   Instead, Accelecare technicians just "dived" the patients. This confirmed Relator's suspicions that Accelecare and the treating physicians were blatantly disregarding Medicare and Medicaid regulations, potentially putting patients at risk, and fraudulently billing Medicare and Medicaid for the HBO therapy.

70.     This was alarming to Relator because she knows Albany Memorial's current Medical Director, Dr. Sloat, who was a treating physician 9 years before when Relator herself worked at Albany Memorial.   At that time, Albany Memorial was using a different management company for HBO therapy, but Relator recalls specifically telling Dr. Sloat that his direct supervision was required for patients undergoing HBO therapy and that she made him do it. Nevertheless, despite the Medical Director's knowledge knowledge of these requirements, Accelecare-Albany Memorial continued the practice of "Diving" patients.

71.     Accelecare routinely submitted these fraudulent and falsely certified bills to the billing department at St. John's and Albany Memorial, causing the hospitals to submit these bills for payment to Medicare and Medicaid.

### C.     Relator Blows the Whistle

72.     In early April 2012, Relator began to notice that the absent physicians were "signing off for billing purposes," and notified her direct supervisor, Donna Jones, Vice President of Operations at Accelecare of the fraudulent billing.

73.     When Relator asked Jan McCarthy, AVP of St. John's, if St. John's was going to self report, McCarthy responded, "fuck'em, let them come for us."

74.     On April 3, 2012, the Relator discovered that there was never any physician coverage for HBO therapy at Accelecare-St. John's on Wednesdays, even though the Wound Center would see patients, and bill for physician services.

75.     On April 5, 2012, a patient had a medical emergency during HBO therapy that required a physician's immediate attention.   The Accelecare technician administering the treatment was unable to promptly reach a physician to attend to the patient's needs.

76.     In response, on April 6, 2012, the Relator spoke with Dr. Patel, who advised her that he was in surgery every morning, and left the building every day by noon, despite being scheduled to see HBO patients, and continuing to sign bills certifying that he had supervised HBO therapy of those patients.

77.     On April 6, 2012, Dr. Tannenbaum told the Relator that he knew there was not sufficient physician coverage for HBO therapy.  He also stated that he was Medical Director of the St. John's wound center "in name only," and that he was not going to do anything for which he was not going to be paid.

78.     On April 26, 2012, Relator spoke with Michael Crouch, Accelecare's Compliance Officer, to highlight again the policy regarding fraudulent billing.

79.     On May 15, 2012, Accelecare stopped offering HBO therapy services to patients at St. John's.  Relator believes that this is because of her persistent complaints about the lack of adequate physician coverage and fraudulent billing.

80.     Over the last several months, Relator had repeated conversations with her supervisors about the lack of physician coverage at the Accelecare-St. John's wound center and about the fraudulent billing scheme.

81.     The response from her immediate supervisor, Donna Jones was "just dive people," and "find a doctor to cover the treatment."

82.     On July 12, 2012 Dr. Tannebaum told the Relator to "go ahead and treat patients," and that he would "wink, wink, nudge, nudge" sign off on the treatments.

83.     Relator's continuing investigation has revealed that this fraudulent scheme is common practice at other Accelecare facilities.

84.     For example, Relator has spoken to the Accelecare Program Director at Albany Memorial Hospital, Mark Leggett, who has made the same complaints to Accelecare management concerning similar fraudulent billing practices as Relator did.  The head clinical RN at Albany Memorial also raised such concerns with the hospital's Medical Director as well as the Accelecare Regional Vice President in charge of this hospital.  All of those complaints have been ignored.

85.     During a company conference call attended by Accelecare's compliance staff and employees from other Accelecare facilities, the same fraudulent billing practices that Relator witnessed at Accelecare-St. John's were discussed.  During the call, a Director from a different

facility than St. John's and Albany Memorial expressed concern that physicians were billing for HBO therapy that they had not physically attended.  The response from Accelecare's compliance staff on the call was "silence."

86.    On September 28, 2012, Relator met with with Paul Antonecchia, the Chief Medical Officer for St. John's and Jan McCarthy, Relator's direct report at the hospital.  Among other things, they discussed the re-opening of the Accelecare-St. John's wound center and specifically addressed how to avoid the problems that caused the facility's closing back in May. During the meeting Antonecchia, who, along with Relator, had just the weekend prior attended a 40-hour training program sponsored by Accelecare followed by an all-day Compliance training session with the hospital, raised concerns to McCarthy that a case could be made for insurance fraud based on Accelecare-St. John's prior operations model -- i.e., Diving patients without direct physician supervision as required and then billing for everything.  McCarthy did not respond, but Relator did and immediately said, "Yes, yes it's insurance fraud.  When you bill for services not rendered that is fraud and that is why we closed the Center down."

87.    McCarthy then responded, "Well that's how they do it in Thomas Jefferson Hospital.  The physicians don't ever see the patients there so . . ."  Indeed, McCarthy based the Accelecare-St. John's model on the Accelecare-Thomas Jefferson Hospital facility in Philadelphia, Pennsylvania.  Accelecare had managed the HBO wound center at Jefferson for several years and served as a model for the physical development for the HBO wound center at St.John's.

88.    Antonecchia replied, that was not how "we were going to do it" at St. John's.  He then told McCarthy and Relator how he had met with Dr. Tannenbaum prior to meeting with them.  And after meeting with Dr. Tannenbaum, Antonecchia continued, he understood just how

- 18 -

little regard Dr. Tannenbaum had for complying with CMS rules and regulations.  Indeed, Dr. Tannenbaum told Antonecchia that a doctor is not required to be present when a patient undergoes HBO therapy, that a doctor can just be in the hospital, and that a doctor does not even have to see the patient.  Dr. Tannenbaum said this even after being told that CMS guidelines require direct supervision and patient contact.  Although Antonecchia mentioned that Dr. Tannenbaum had wanted more physicians to cover the HBO schedule before the center opened in 2011, it was quite clear during the meeting that McCarthy was aware of the issue of physician oversight and was complicit in the fraudulent billing to a much higher degree than Relator realized.

89.     In a private conversation between Relator and Antonecchia following this September 28 meeting, Antonecchia apologized to Relator and acknowledged she was the first to raise the problems of insurance fraud, including Medicare and Medicaid fraud, and that he did not give it the attention that it needed.

90.     Relator believes that she is "the only thing standing in the way" of Defendants continuing to "dive" patients and fraudulently bill Medicare and Medicaid.  As such, Relator fears for her job security.  In fact, during the week of September 24, Accelecare corporate representatives met with Relator, who believes she was assigned unattainable goals and is being set up to fail so that the company can terminate her.

### D.     Examples of Defendants' False Claims

91.     Defendants have submitted, or caused to be submitted, numerous false or fraudulent claims to Medicare and Medicaid for HBO therapy.

92.     For example, between September 1, 2011 and April 5, 2012, there were at least 155 HBO therapy sessions fraudulently billed to Medicare and Medicaid from the single

Accelecare-St. John's location, including:

| Patient No. | Visit Date | Visit Time | Visit Status | Wound Care Physician |
|---|---|---|---|---|
| 1 | 11/26/2011 | 11:45 | Made | Tannenbaum, MD, Gary |
| 1 | 11/27/2011 | 11:45 | Made | Tannenbaum, MD, Gary |
| 1 | 11/30/2011 | 11:45 | Made | Tannenbaum, MD, Gary |
| 1 | 12/6/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 1 | 12/7/2011 | 11:45 | Made | Tannenbaum, MD, Gary |
| 1 | 12/14/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/8/2011 | 17:36 | Made | Tannenbaum, MD, Gary |
| 2 | 9/9/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/12/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/14/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/15/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/16/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/19/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/20/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/21/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/23/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/26/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/28/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/29/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/30/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 2 | 10/5/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/29/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 2 | 9/30/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 2 | 10/5/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 3 | 9/1/2011 | 14:00 | Pending | Tannenbaum, MD, Gary |
| 3 | 9/2/2011 | 14:00 | Pending | Tannenbaum, MD, Gary |
| 3 | 9/8/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 3 | 9/9/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 3 | 9/12/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 3 | 2/15/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/16/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/17/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/20/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/21/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/22/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/23/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/24/2012 | 12:30 | Made | Tannenbaum, MD, Gary |

| Patient No. | Visit Date | Visit Time | Visit Status | Wound Care Physician |
|:---:|:---:|:---:|:---:|:---:|
| 3 | 2/27/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/28/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 2/29/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/2/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/5/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/6/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/7/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/8/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/9/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/12/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/13/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/14/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/15/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/16/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/19/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/20/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/21/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 3 | 3/22/2012 | 12:30 | Made | Tannenbaum, MD, Gary |
| 4 | 9/12/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 9/13/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 9/14/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 9/15/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 9/16/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 9/19/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/4/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/5/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/6/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/7/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/10/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/11/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/17/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/18/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/19/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/21/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/25/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/26/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 4 | 10/27/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 6 | 10/26/2011 | 10:00 | Made | Tannenbaum, MD, Gary |

| Patient No. | Visit Date | Visit Time | Visit Status | Wound Care Physician |
|---|---|---|---|---|
| 6 | 11/2/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 6 | 12/28/2011 | 10:00 | Made | Patel, Nirav |
| 6 | 1/4/2012 | 10:00 | Made | Patel, Nirav |
| 6 | 1/9/2012 | 10:00 | Made | Patel, Nirav |
| 6 | 1/18/2012 | 10:00 | Made | Patel, Nirav |
| 7 | 11/28/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 11/29/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/1/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/7/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/8/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/9/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/13/2011 | 12:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/19/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/20/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/21/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/22/2011 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 12/27/2011 | 8:00 | Made | Patel, Nirav |
| 7 | 12/28/2011 | 8:00 | Made | Patel, Nirav |
| 7 | 12/29/2011 | 8:00 | Made | Patel, Nirav |
| 7 | 12/30/2011 | 8:00 | Made | Patel, Nirav |
| 7 | 1/3/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 1/4/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 1/6/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/1/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/2/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 3/5/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/6/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 7 | 3/7/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/8/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/12/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/13/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/14/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/15/2012 | 8:00 | Made | Patel, Nirav |
| 7 | 3/16/2012 | 8:00 | Made | Patel, Nirav |
| 8 | 2/29/2012 | 10:00 | Made | Patel, Nirav |
| 8 | 3/2/2012 | 10:00 | Made | Patel, Nirav |
| 8 | 3/6/2012 | 10:00 | Made | Patel, Nirav |
| 8 | 3/7/2012 | 10:00 | Made | Patel, Nirav |

| Patient No. | Visit Date | Visit Time | Visit Status | Wound Care Physician |
|---|---|---|---|---|
| 8 | 3/14/2012 | 10:00 | Made | Patel, Nirav |
| 11 | 11/2/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 11 | 11/9/2011 | 11:30 | Made | Tannenbaum, MD, Gary |
| 11 | 11/16/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 11 | 11/23/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 11 | 11/30/2011 | 10:00 | Made | Tannenbaum, MD, Gary |
| 16 | 9/1/2011 | 14:30 | Pending | Tannenbaum, MD, Gary |
| 16 | 9/2/2011 | 14:30 | Pending | Tannenbaum, MD, Gary |
| 16 | 9/3/2011 | 14:30 | Pending | Tannenbaum, MD, Gary |
| 16 | 9/19/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 9/21/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 9/22/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 9/23/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 9/26/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 9/28/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 9/29/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 9/30/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 10/3/2011 | 12:00 | Made | Tannenbaum, MD, Gary |
| 16 | 10/4/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 10/6/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 10/7/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 10/10/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 10/11/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 16 | 10/13/2011 | 14:00 | Made | Tannenbaum, MD, Gary |
| 17 | 2/6/2012 | 13:00 | Made | Patel, Nirav |
| 17 | 2/8/2012 | 9:00 | Made | Patel, Nirav |
| 17 | 2/9/2012 | 9:00 | Made | Patel, Nirav |
| 18 | 1/18/2012 | 9:00 | Made | Tannenbaum, MD, Gary |
| 18 | 1/25/2012 | 9:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/1/2012 | 9:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/8/2012 | 9:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/15/2012 | 8:30 | Made | Tannenbaum, MD, Gary |
| 18 | 2/20/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/21/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/22/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/23/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/24/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/27/2012 | 8:00 | Made | Tannenbaum, MD, Gary |

| Patient No. | Visit Date | Visit Time | Visit Status | Wound Care Physician |
|---|---|---|---|---|
| 18 | 2/28/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 18 | 2/29/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 18 | 3/1/2012 | 8:00 | Made | Tannenbaum, MD, Gary |
| 18 | 3/2/2012 | 8:00 | Made | Tannenbaum, MD, Gary |

93.     The above chart indicates, for each patient visit, the date and time HBO therapy was provided and the treating Wound Care Physician.  For all of these visits, the Wound Care Physician assigned (i.e., Dr. Tannenbaum or Dr. Patel) did not see the patients, all of whom were Medicare or Medicaid beneficiaries, nor was the Wound Care Physician on-site or accessible as required.  As became standard operating procedure, Accelecare simply "Dived" the patient.

94.     When submitting the claims for payment to Medicare or Medicaid, for each of the HBO therapy visits listed in Paragraph 92 above, the Wound Care Physician (i.e., Dr. Tannenbaum or Dr. Patel) certified that he had provided "physician services" when in fact, it was impossible for him to do so as he was not on-site.  Accordingly, each and every certification was false.

95.     Similarly, when Accelecare submitted the claim for payment to Medicare through St. John's for each of the HBO therapy visits listed in Paragraph 92 above, Accelecare, knowing of the Wound Care Physician's absence during each of these procedures, also falsely certified that the HBO treatment was performed in accordance with the physician examination/on-site requirement.

96.     As a result of the Wound Care Physician's and Accelecare's misconduct, the claims submitted for each and every HBO therapy service of the patients listed in Paragraph 92 above, were false.

97.     As discussed in Paragraph 68 above, Accelecare-Albany Memorial also engaged in the practice of "Diving" patients and falsely certified that the HBO treatment was performed

in accordance with the physician examination/on-site requirement. Accordingly, as a result of Accelecare-Albany Memorial's misconduct, the claims submitted for each and every HBO therapy service of the patients discussed in Paragraph 69 were false.

## COUNT I
### Federal False Claims Act Violations for Submission of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

98.     Relator re-alleges and incorporates the allegations in Paragraphs 1-97 as if fully set forth herein.

99.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

100.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).[1]

101.    Each claim for payment that was submitted or caused to be submitted for each Medicare and/or Medicaid beneficiary who received Hyperbaric Oxygen therapy from Defendants was false or fraudulent as a result of Defendants' illegal schemes as described herein and would not have been paid but for Defendants' fraudulent conduct.

102.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

---

[1] The False Claims Act was amended by Congress as part of the Fraud Enforcement and Recovery Act of 2009, Pub.L. 111-21 (May 20, 2009) (the "FERA amendments"), and again as part of the Patient Protection and Affordable Care Act, Pub.L. 111-148 (March 23, 2010). The FERA amendments modified and renumbered the subsections of § 3729(a). The amendments made to section 3729(a)(1) (now numbered 3729(a)(1)(A)) are not retroactive, and therefore the 1986 version of the False Claims Act applies to Defendants' conduct prior to May 20, 2009.

<u>**COUNT II**</u>
**Federal False Claims Act Violations for False Records and Statements**
**Made to Get False Claims Submitted Paid**
**31 U.S.C. § 3729(a)(1)(B)**

103.    Relator re-alleges and incorporates the allegations in Paragraphs 1-97 as if fully set forth herein.

104.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

105.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements material to false or fraudulent claims paid or approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).[2]

106.    Each record or statement that was submitted or caused to be submitted for each Medicare and/or Medicaid beneficiary who received Hyperbaric Oxygen therapy from Defendants as a result of Defendants' illegal schemes as described herein represents a false or fraudulent record or statement material to the false or fraudulent claims paid by the United States for such services rendered.

107.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

---

[2] The FERA amendments to subsection 3729(a)(2) (now numbered 3729(a)(1)(B)) are expressly made applicable to claims pending as of June 7, 2008.  *See* Pub. L. 111-21, Sec. 4(f)(1) (stating this change should be deemed to "take effect as if enacted on June 7, 2008" and should "apply to all claims under the False Claims Act (31 U.S.C. 3729 *et seq.*) that are pending on or after that date").

## COUNT III
### Violation of the New York False Claims Act
### N.Y. State Finance Law § 189

108.     Relator re-alleges and incorporates the allegations in Paragraphs 1-97 as if fully set forth herein.

109.     This is a claim for treble damages and civil penalties under the New York False Claims Act, NY State Finance Law § 187 *et seq.*

110.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

111.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

112.     The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal schemes to defraud the state's Medicaid program.

113.     By reason of the Defendant's acts, the State of New York has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

114.     The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

115.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator Jennifer Lyon requests that judgment be entered against Defendants, ordering that:

A.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, and the equivalent provisions of the New York FCA set forth above;

B.      Defendants pay not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461; Public Law 104-410), plus three times the amount of damages the United States has sustained because of their actions;

C.      this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of $12,000 for each violation of N.Y. State Fin. § 189(1);

D.      Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and N.Y. State Fin. § 190(6);

E.      Relator be awarded all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d) and N.Y. State Fin. § 190(7);

F.      Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

G.      Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

H.      The United States, the State of New York, and Relator be awarded such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

DATED:   October _11_ , 2012

Respectfully submitted,

**MILBERG LLP**

By: _____

Ariana J. Tadler
   atadler@milberg.com
Kirk E. Chapman
   kchapman@milberg.com
Rolando G. Marquez
   rmarquez@milberg.com
One Pennsylvania Plaza
New York, New York  10119-0165
Tel:   212.594.5300
Fax:   212.868.1229

*Attorneys for Plaintiff and Relator Jennifer Lyon*